**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————x

KEITH DIETRICH.

No. 18 Civ. 7544 (CM)

             Plaintiffs,

     v.

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, CHIEF OF INTELLIGENCE
BUREAU THOMAS GALATI, NYPD COMMANDING
OFFICER HOWARD REDMOND, NYPD
LIEUTENANT KARL PFEFFER, AND NYPD
SERGEANT PAUL BRISCOE

             Defendants.

————————————————————————x

## DECISION AND ORDER GRANTING
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.:

     After serving in the New York City Police Department ("NYPD") for 28 years, Plaintiff

Keith E. Dietrich brought this action claiming that his career stalled out due to age

discrimination. Dietrich alleges that his supervisors, who hoped to force him into retirement,

gave him inferior assignments, denied him a promotion, and subjected him to a hostile work

environment.

     Dietrich seeks recovery from the NYPD and the City of New York ("the City"), as well

as certain officers in his chain of command, including Chief of the NYPD Intelligence Bureau

Thomas Galati ("Galati"), Inspector Howard Redmond ("Redmond"), Lieutenant Karl Pfeffer

("Pfeffer"), and Sergeant Paul Briscoe ("Briscoe") (collectively, the "Individual Defendants"),

under the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §

1

621 *et seq.*, the New York State Human Rights Law ("NYSHRL"), NY. Exec. Law § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8 *et seq.*

On May 16, 2019, the Court dismissed all of Dietrich's claims against the NYPD, the ADEA claim against the individual defendants (Count 1), and the hostile work environment claims against Chief Galati (Counts 4 and 5). *See Dietrich v. City of New York*, No. 18-cv-7544 (CM), 2019 WL 2236585 (S.D.N.Y. May 16, 2019) (Dkt. No. 61, "Dismissal Order"). The Court denied Defendant's motion to dismiss with respect to Dietrich's claims against the City, the failure to promote claims against the Individual Defendants, and the hostile work environment claims against Redmond, Pfeffer, and Briscoe.

Defendants now move for summary judgment on Dietrich's remaining claims. (Dkt. No. 88.) The motion is GRANTED, and the complaint is dismissed.

## BACKGROUND

The following facts are drawn from the Defendants' Rule 56.1 statement of undisputed facts and Plaintiff's response, as well as the parties' declarations, depositions, and other documentary evidence submitted in connection with the Defendants' summary judgment motion. (*See* Dkt. Nos. 89–92, 110, 111.) For purposes of deciding the motion, the facts have been construed in the light most favorable to Plaintiff, and conflicts in the evidence have been resolved in his favor. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 80 (2d Cir. 2018).

Although Plaintiff failed to submit his own Rule 56.1 statement, the Court has conducted an independent review of the record, and confirmed that the facts set forth below are undisputed. *See Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 658 (S.D.N.Y. 2012) (citing *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ("While a court is not required to consider

what the parties fail to point out in their Local Rule 56.1 statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement.") (internal quotations and citations omitted)).

## A. The Parties

Plaintiff was a police officer employed by the NYPD since 1990. (*See* Dkt. No. 89 ("Def.'s 56.1),¶ 47.) After performing 18 months of investigative work, he received an automatic promotion to Detective Third Grade on October 12, 1997. (*Id.* ¶ 51.)

Defendant Chief Thomas Galati oversees the uniformed aspect of the Intelligence Bureau, exercising command over the units in which Plaintiff worked during the time period relevant to this lawsuit. (*Id.* ¶ 4.)

Defendant Inspector Howard Redmond reports directly to Chief Galati and is the Commanding Officer of the Municipal Security Section, which houses both units in which Plaintiff worked during the time period relevant to this lawsuit. (*Id.* ¶¶ 9, 10.)

Defendant Lieutenant Karl Pfeffer served under Redmond and was in charge of the Executive Protection Unit from 2014 to 2018. From 2014 to 2016, Pfeffer was Plaintiff's direct report. (*Id.* ¶ 27.)

Defendant Sergeant Paul Briscoe served as Plaintiff's supervisor in the Executive Protection Unit from April of 2017 to December of 2018. (*Id.* ¶ 34.)

## B. Dietrich reaches the rank of Detective Second Grade.

There are three grades of detective in the NYPD, with Third Grade being the lowest and First Grade being the highest. (*See* Def.'s 56.1 ¶ 33.) Detectives receive promotions to the ranks of Detective Second Grade and Detective First Grade at the discretion of their chain of command. Most detectives receive a formal recommendation for promotion from their

supervisor, the head of their particular unit, or another high-ranking NYPD official. (*Id.* ¶ 35.) All the detectives receiving recommendations are placed on a list known as a "grid" ranking the officers by years of experience; a certain number of the most senior officers on the grid are promoted an annual basis. (Dkt. 91, Dandrige Decl. Ex. A, Dietrich Tr. at 13:16-15:25.) Final decisions regarding promotions are made by the Police Commissioner's office. (Def.'s 56.1 ¶ 37.)

After serving in the NYPD for seventeen years, ten of which he spent at the rank of Detective Third Grade, Dietrich made Detective Second Grade in 2007, when he was 44 years old. (*Id.* ¶ 56.) In 2012, and again in 2013, Dietrich was recommended for the rank of Detective First Grade by his then-supervisor, but was not selected for promotion from the grid. (*Id.* ¶¶ 57-60.) In the Dismissal Order, the Court ruled that Dietrich's claims of age discrimination based on these rejections were time-barred. (Dismissal Order, at 12-13.)

### C. Dietrich joins the Executive Protection Unit.

Twice snubbed, Dietrich sought a transfer to a unit where he could "get promoted before [he] retired." (Dietrich Tr. at 49:25-50:5.) He believed that joining the Mayor's "very prestigious" personal security detail, known as the Executive Protection Unit ("EPU"), would do the trick. (*Id.* at 49:10.)

The EPU is one of two units within the Municipal Security Section of the NYPD ("MSS"); the other is the Uniform Operations Unit ("UOU"). (Def.'s 56.1 ¶ 8.) The UOU stands guard at City Hall and Gracie Mansion, while the EPU provides personal security to the Mayor and his family. (*Id.* ¶¶ 11, 12, 14-16.) Most of the 90 members of the UOU are uniformed officers who work regular 8-hour shifts five days a week, while the 24 officers in the EPU work two 17-hour tours per week, with four days off in between. (*Id.* ¶¶ 17, 30.) Whether the

members of the UOU and the EPU are "intertwined units" whose members "can be used to fill vacancies or act as support in the other unit" is a disputed issue of fact, albeit one that turns out not to be material to the resolution of this case. (Dkt. No. 111, Pl's. 56.1 ¶ 28.)

Dietrich, who was only interested in joining the EPU, enlisted his connections within the NYPD to secure the recommendation of Deputy Police Commissioner John Miller, who expedited the transfer process.  (Dietrich Tr. at 54:19-55:5.) Dietrich soon met with Defendant Redmond, the commanding officer of MSS, and Defendant Pfeffer, who supervised the EPU from 2014 to 2018. (Def.'s 56.1 ¶¶ 27, 71, 73.)

At their initial meeting, Redmond asked Dietrich if he planned to retire if promoted to Detective First Grade.  (Dietrich Tr. at 55:13-56:3.)  Redmond said that he preferred to staff the EPU with officers who were willing to serve for the remainder of the Mayor's time in office.  (*Id.*)  At the time, this could have meant a seven-year commitment, since the Mayor was in the first year of his first four-year term, and was eligible for reelection. Dietrich assured Redmond that he had no plan to retire, even if he were promoted.  (*Id.*)

Dietrich joined the EPU on June 11, 2014. (Def.'s 56.1 ¶ 69.)

**D. Dietrich is reassigned to the Uniform Operations Unit.**

Dietrich's behavior and temperament on the job troubled the Individual Defendants during the first of his two stints with the EPU.  (*See* Def.'s 56.1 ¶¶ 88-93.)  In 2015, Redmond observed Dietrich watching videos on an iPad while on duty. Chief Galati noted that Dietrich "often . . . would be standing around with a toothpick in his mouth," a habit that displeased the Mayor's chief of staff.  (Dkt. 91, Dandrige Decl. Ex. D, Galati Tr. at 112:5-19.)  Redmond also reported finding Dietrich asleep in one of the security vehicles parked outside City Hall, which resulted in Pfeffer giving Dietrich a verbal warning. (Def.'s 56.1 ¶ 90.) Eventually, Galati and

Redmond came to the conclusion that Dietrich was "difficult" and "not a team player." (*See, e.g.*, *Id.* ¶ 91.)

Dietrich denies that the sleeping incident occurred, but admits the rest.  (*See Id.* ¶¶ 88, 89, 93.)  Although Dietrich claims that his performance reviews never mentioned these issues, neither party has submitted the performance reviews from Dietrich's first two years as a member of the EPU, and since it is undisputed that all but the sleeping incident occurred, it is not necessary to consider whether the performance reviews mentioned them or not.

In the fall of 2016, the UOU was understaffed due to retirement, while the EPU was overstaffed after the unit disbanded the detail charged with protecting the Mayor's children. (*Id.* ¶¶ 78-79.) To right-size both units, Redmond temporarily reassigned three EPU detectives to the UOU.  (*Id.* ¶ 81.)  Dietrich, then 53 years old, was one of the three, as was another Detective Second Grade, Alex Pelepelin, who was 49.  The last transferee was Detective Third Grade Chris Fowler, who was 45 at the time of the reassignment. (*Id.* ¶¶ 82-87.)

When Dietrich learned that he was being reassigned, he was upset and frustrated; Briscoe claimed he overheard Dietrich directing profanities and slurs towards Redmond's family.  (*Id.* ¶ 94.)  Dietrich felt degraded by having to wear a uniform as a member of the UOU, and was displeased to be stationed at the rear booth of City Hall, which received minimal traffic. (*Id.* ¶¶ 95, 97.)  He was the oldest EPU detective to be assigned to the rear booth.  (*Id.* ¶ 98.)  He also disliked working the 4 p.m. to 12 a.m. shift five days a week, a substantially different schedule from what he was accustomed to with the EPU, and one that interfered with his second job and child visitation schedule. (*Id.* ¶ 95.)

When reviewing Dietrich's performance for the period May 16, 2016 through May 15, 2017, Defendant Pfeffer wrote that "Dietrich's comportment [while assigned to the UOU] was

terrible, he was outwardly disgruntled and his disenchantment was obvious." (Dkt. 91, Dandrige Decl. Ex. L, at 2.)  Confirming Briscoe's account, Pfeffer reported "experienc[ing] Det [sic] Dietrich's utilization of crass obscenities toward supervisors personally." (*Id.*)

Redmond told the transferred EPU detectives that their assignment to the UOU would last three months.  (*Id.* ¶ 103.)  However, Dietrich spent five months there, which was longer than the other two detectives who had been reassigned. Fowler, who also worked a uniformed post while in the UOU, circulated back to the EPU a month or two before Dietrich  (*Id.* ¶ 104.); and Pelepelin spent less than a month in the UOU before transferring out of the MSS entirely. (*Id.* ¶ 10.) Throughout the period of his reassignment, Dietrich's salary, benefits, and eligibility for promotion remained the same.

Dietrich claims he was reassigned – and that his reassignment lasted longer than the reassignments of the other two detectives – because Redmond personally disliked him and wanted him to retire. (*Id.* ¶¶ 99, 106.) On March 20, 2017, Dietrich brought these concerns to Chief Galati, Redmond's commanding officer, during a meeting the Chief had scheduled to address Dietrich's perceived lack of professionalism.  (*Id.* ¶ 112.)  Galati offered to transfer Dietrich to the Operations Desk, where he could return to his previous schedule. But Dietrich declined the offer because he thought working at the Operations Desk would hurt his chances of making Detective First Grade. (*Id.* ¶¶ 113-114.)

Dietrich also testified that Galati told him, at their March 20 meeting, that Redmond had referred to Dietrich as a "hairbag." (*Id.* ¶ 117.)  While Dietrich now defines "hairbag" as "an older officer who is just waiting to retire," (Bellovin Decl., Ex. 6, Dietrich Decl. ¶ 16), during his deposition he said something entirely different; he testified that a "hairbag" was an officer, whether younger or older,  "who thinks they know it all," (Dietrich Tr. at 105:6-20).  He also

testified that he never heard Redmond or any other NYPD employee call him a "hairbag" directly; he only heard Galati relay Redmond's purported comment. (Def. 56.1 ¶ 120.)  Dietrich also admits that Galati "did not say anything discriminatory" other than the second-hand "hairbag" comment.  (*Id.* ¶ 124.) Needless to say, Galati denies ever having told Dietrich that Redmond had called him a "hairbag."

### E.  Dietrich returns to the EPU, is transferred to the Dignitary Protection Unit, and retires.

In April 2017, Dietrich returned to the EPU and his preferred two-days-on-four-days-off schedule, under the command of Defendant Briscoe.  (Def.'s 56.1 ¶ 125.)  Dietrich testified that Briscoe hated him, and gave him assignments designed to make Dietrich want to retire. (*Id.* ¶¶ 127-128.) For example, over a period of nineteen months from May 2017 to December 2018, Briscoe sent Dietrich to guard City Hall 39 times, rather than allow him to be part of one of the Mayor's personal security details.  (*Id.* ¶¶ 129-130.)  In March of 2018, Briscoe issued a command discipline against Dietrich for being "discourteous" and "argumentative" when receiving one of these City Hall assignments.  (Dkt. 91, Dandrige Decl. Ex. K.)

Nine months later, Deputy Commissioner Miller informed Dietrich that he would be transferred out of EPU, but that Dietrich would have final say over where he landed and what role he would fill in his new unit.  (*Id.* ¶ 138.)  Dietrich did not want to transfer again, but said that he preferred to go to a unit within the Public Security Section, where he could have his preferred schedule.  (*Id.* ¶ 140.)  Miller honored that request: Dietrich became a driver in Congressman Jerrold Nadler's security detail, known as the Dignitary Protection Unit ("DPU") where he enjoyed the same schedule, salary and overtime benefits.  (*Id.* ¶¶ 141-145.)

The parties dispute whether Redmond and Galati were responsible for Dietrich's transfer to the DPU.  The defendant officers testified that they were not involved, while Dietrich claims

that the move was politically motivated because his superiors did not like him, and "were deliberately holding back [his] promotion . (*Id.* ¶¶ 148-150; Dietrich Decl. ¶ 18.)  There is no record evidence corroborating Dietrich's speculation about how his transfer out of MSS came about.

Plaintiff retired from the NYPD on July 26, 2019, when he was 55 years of age. (Def.'s 56.1 ¶ 147; Dandrige Decl. Ex. E, at 1.)

### F.  Promotions of Other Officers During the Relevant Time Period

None of the Individual Defendants recommended Dietrich for promotion during his time in MSS.  Because Dietrich's disparate treatment and failure to promote claims depend upon his claim that he was discriminated against due to his membership in a protected class, a brief summary of promotions awarded to other persons in Dietrich's protected class is relevant to the pending motion.

The parties do not dispute that the following promotions occurred after Dietrich was first recommended for the rank of Detective First Grade in 2012 at the age of 49: (i) Detective Theodore Wallace received the rank of Detective First Grade, in part due to Redmond's recommendation, on August 1, 2016, when Wallace was 53 years old (Def. 56.1 ¶¶ 153-155); Detective Daniel Rivera received the rank of Detective First Grade, in part due to Redmond's recommendation, on October 28, 2016, when Rivera was 49 years old (*Id.* ¶¶ 156-158); and Detective Katrina Brownlee received the rank of Detective First Grade, in part due to Redmond's recommendation, on December 20, 2017, when Brownlee was 47 years old, (*Id.* ¶¶ 159-161).

## LEGAL STANDARD

A court should grant summary judgment when there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a); *see Allianz Ins. Co. v. Lerner,* 416 F.3d 109, 113 (2d Cir. 2005). Genuine issues of material fact cannot be created by conclusory allegations. *Davis v. State of New York*, 316 F.3d 93, 100 (2d Cir. 2002). Summary judgment is appropriate only when, after drawing all reasonable inferences in favor of a non-movant, no reasonable juror could find in favor of that party. *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (2d Cir. 1986))

In assessing when summary judgment should be granted, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Id.* (citation omitted) (emphasis in original). "Conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).  Instead, when the moving party has documented particular facts in the record, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *FDIC v. Great Am. Ins. Co.,* 607 F.3d 288, 292 (2d Cir. 2010). Establishing such evidence requires going beyond the allegations of the pleadings, as the moment has arrived "to put up or shut up." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted). Thus, unsupported allegations in the pleadings cannot create a material issue of fact. *Id.* Likewise, a party may not create an issue of fact "simply by submitting an affidavit contradicting his own prior testimony." *Hayes v. New York City Dept. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

## DISCUSSION

**I.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DISPARATE TREATMENT CLAIMS.**

Plaintiff claims he was treated differently than similarly situated employees because of his age.  Specifically, Dietrich claims that age-based animus motivated the Defendants' decisions to: (i) temporarily reassign him to the UOU, (ii) sporadically station him at City Hall while he was a member of the EPU; (iii) transfer him to the DPU; and (iv) deny him promotion.  Because Plaintiff has not offered evidence to substantiate these claims of disparate treatment, Defendants' motion for summary judgment is granted.

**a.   <u>Governing Law</u>**

i.   *ADEA and NYSHRL*

Courts in this Circuit analyze claims of age-based disparate treatment brought under the ADEA and the NYSHRL using the same standard: the three-step burden shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g.*, *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 (2d Cir. 2010).  "The law governing ADEA claims has been held to be identical to that governing claims made under the [NYSHRL]." *Id.* n.6.

Under either the ADEA or the NYSHRL, the plaintiff must first establish a prima facie case of discrimination, by demonstrating that: "1) he was within the protected age group; 2) he was qualified for the position; 3) he was subject to an adverse employment action; and 4) the adverse action occurred under 'circumstances giving rise to an inference of discrimination.'" *Terry v. Ashcroft*, 336 F.3d 128, 137–38 (2d Cir. 2003) (quoting *Roge v. NYP Holdings, Inc.,* 257

F.3d 164, 168 (2d Cir.2001)). "The burden of proof that must be met to establish a prima facie case is minimal." *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 199 (2d Cir. 1999).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate legitimate, nondiscriminatory business reasons" for the adverse employment action. *Schnabel v. Abramson,* 232 F.3d 83, 87 (2d Cir.2000).

Once the defendant has proffered evidence supporting a neutral reason for its treatment of the plaintiff, "the plaintiff can no longer rely on the prima facie case, but may still prevail if [he] can show that the employer's determination was in fact the result of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) The Court must decide whether "the evidence, viewed in the light most favorable to the plaintiff, would permit a jury to find . . . 'that age was the 'but-for' cause of the challenged adverse employment action.'" *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d (2009)). "The condition that a plaintiff's age must be the 'but for' cause of the adverse employment action is not equivalent to a requirement that age was the employers *only* consideration, but rather that the adverse employment action[ ] *would not have occurred without it.*" *Fagan v. U.S. Carpet Installation, Inc.,* 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011) (citing *Gross*, 557 U.S. at 175-77) (emphasis in original).

### ii. NYCHRL

Unlike its state and federal analogues, the NYCHRL does not require proof of but-for causation. Rather, a plaintiff bringing an age discrimination lawsuit under the city code may defeat summary judgment by presenting evidence "from which it could rationally be inferred that age discrimination was a motivating factor, even in part" for his employer's actions. *Forrester v.*

*Corizon Health, Inc.*, 278 F. Supp. 3d 618, 627 (E.D.N.Y. 2017) (quoting *Melman v. Montefiore*

*Med. Ctr.*, 98 A.D.3d 107, 128, 946 N.Y.S.2d 27, 41 (2012)).

> b.  **Plaintiff's disparate treatment claims under the ADEA and the NYSHRL fail to raise a genuine issue of material fact that age-based animus was the but-for cause of Defendants' conduct.**

> > i.  *Prima Facie Case of Discrimination*

The first two elements of Dietrich's prima facie case are not in dispute.  Dietrich falls

within a protected class: both the ADEA and NYSHRL prohibits discrimination in employment

on the basis of age against persons aged 40 or older.  29 U.S.C. §§ 623(a)(1), 631(a); N.Y. Exec.

Law § 296(1). And, with over twenty years' experience as a police officer and numerous

commendations to his name, Dietrich was clearly qualified for his position during the relevant

time period: Detective Second Grade.  (*See* Dkt. No. 110, Bellovin Decl. Exs. 8 & 9.)

Rather, Defendants argue that Dietrich has failed to offer any evidence that he suffered an

adverse employment action – or, if he did, that it was because of his age. For the reasons that

follow, I agree with Defendants.

> 1.  Assignments to the UOU and City Hall

Dietrich claims that he suffered adverse employment actions when he was assigned to

City Hall, both when Redmond temporarily transferred him to the UOU on an everyday basis,

and when Briscoe sent him there sporadically after Dietrich returned to the EPU.  However, in

order to establish that these assignments give rise to a discrimination claim, Dietrich must allege

that they transcended "mere inconvenience or an alteration of job responsibilities." *Galabya v.*

*New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000).  He has not made that showing.

Materially adverse changes include "termination of employment, a demotion evidenced

by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices . . . unique to a particular situation." *Terry*, 336 F.3d at 138 (quoting *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997). An involuntary transfer "may constitute an adverse employment action if the plaintiff 'show[s] that the transfer created a materially significant disadvantage' with respect to the terms of the plaintiff's employment." *Williams v. RH Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (quoting *Galabya*, 202 F.3d at 641).

However, "subjective, personal disappointments do not meet the objective indicia of an adverse employment action." *Id.* Accordingly, "It is well-settled that a lateral transfer does not rise to the level of an adverse employment action as a matter of law," where the transfer has no impact on the employee's position, salary, or benefits. *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005). That means a reassignment requiring an employee "to perform . . . work . . . less to his liking" does not, on its own, constitute an adverse employment action. *Jimenez v. Donahoe*, 968 F. Supp. 2d 609, 621 (S.D.N.Y. 2013).

Plaintiff claims that his temporary assignment to the UOU was not a lateral move, but rather a step down "from an 'elite' position with opportunity for advancement to a less prestigious position with little opportunity for professional growth," which the Second Circuit has found actionable under Title VII. *Garber v. New York City Police Dep't*, 159 F.3d 1346, 1998 WL 514222, at *4 (2d Cir. 1998). But Dietrich offers no evidence that his temporary transfer to the UOU was damaging to his career. For one thing, he retained his same rank, salary, and benefits. He also continued to serve on a security detail that frequently provided protection to the most important officials in the City government. (*See* Def.'s 56.1 ¶ 97.) He also returned to the EPU within six months of his reassignment, and thereafter spent more time in the Mayor's security detail than at City Hall. (*See* Dkt. No. 91, Dandrige Decl. Ex. J.)

Dietrich also says that the temporary transfer lessened his chances of promotion.  But no evidence in the record suggest that officers assigned to the UOU were promoted at lower rates or less frequently than EPU officers were. An officer's belief that a new assignment might interfere with some anticipated future benefit, without more, is not enough to create a genuine dispute over the existence of an adverse employment action. For example, in *Roman-Malone v. City of New York*, No. 11-cv-8650, 2013 WL 3835117 (S.D.N.Y. July 25, 2013), the court found that a police officer failed to prove an adverse employment action where a temporary assignment to a foot post had no material effect on her pension as compared to her prior position.  *Id.* at *6.  Similarly, the court in *Guzman v. City of New York*, 93 F. Supp. 3d 248 (S.D.N.Y. 2015) found that an assignment that reduced an officer's potential for overtime pay did not amount to an adverse employment action. *Id.* at 259.  Therefore, Dietrich's speculation – and it is nothing more than speculation --  that the transfer hurt his promotion prospects is not an adequate basis for a trier of act to find that the transfer materially altered the terms and conditions of Dietrich's position.

Nor can Plaintiff survive Defendant's motion for summary judgment on the strength of his contention that Briscoe's decision to send him to City Hall was an adverse employment action because it resulted in a more cumbersome commute.  (*See* Dietrich Tr. at 111:14-112:9.)  "A longer commute . . . 'is an inconvenience, not an adverse employment action.'" *Smalls*, 396 F. Supp. 2d at 371 (citing *Galabya*, 202 F.3d at 640).

Therefore, Defendants are entitled to summary judgment on Plaintiff's claims that his assignments away from the Mayor's security detail to stand guard at City Hall and Gracie Mansion constituted disparate treatment on the basis of age.

2.   Transfer to Dignitary Protection Unit

Dietrich also claims that his involuntary transfer to Congressman Nadler's security detail
qualifies as an adverse employment action.

As with the other reassignment allegations, the record evidence does not support the
conclusion that the transfer to the DPU was an adverse employment action. The transfer to the
DPU does not count as a "material adverse change," because Dietrich kept his preferred
schedule, salary, and benefits.  (Def.'s 56.1 ¶ 145.)  Again, "subjective, personal
disappointments" alone do not prove an adverse employment action. *Williams*, 368 F.3d at 128
(quoting *Galabya*, 202 F.3d at 641).

Moreover, there is no evidence in the record that any Individual Defendant alleged to
have acted with discriminatory intent was responsible for Dietrich's transfer to the DPU.  The
parties agree that Deputy Commissioner Miller informed Dietrich he would be transferring out of
the EPU, and it was Deputy Commissioner Miller who suggested the DPU as a landing spot.
(Def.'s 56.1 ¶¶ 138, 141.)  Both Redmond nor Galati  testified that they played no role in
Plaintiff's transfer out of the EPU. (Dandrige Decl. Ex. B, Redmond Tr. At 122:14-123:14; Ex.
D, Galati Tr. At 169:5-9.)  Dietrich insists that they were both involved,  (Pl.'s 56.1 ¶ 150.), but
that is sheer speculation. He offers no evidence to support his belief. Saying that he is "sure"
Galati made the move to get him out of the EPU (Dietrich Tr. at 113:16-114:10.) is not evidence
that Galati did anything at all. Dietrich's "purely conclusory allegations . . . absent any concrete
particulars" are insufficient to take a claim of employment discrimination to trial. *Cameron v.
Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003).

Dietrich has thus failed to prove a prima facie case of discrimination in connection with
his transfer to the DPU.

### 3. Failure to promote Dietrich to Detective First Grade

The core of Plaintiff's case is that he was denied promotion on the basis of his age.  He

has made out a prima facie case with respect to this adverse employment action.

> "To establish a *prima facie* case of a discriminatory failure to promote, a Title VII
> plaintiff must ordinarily demonstrate that: (1) she is a member of a protected class; (2)
> she applied and was qualified for a job for which the employer was seeking applicants;
> (3) she was rejected for the position; and (4) the position remained open and the
> employer continued to seek applicants having the plaintiff's qualifications."

*Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (quoting

*Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004). As with all disparate treatment claims,

the plaintiff must show that he "'was rejected under circumstances which give rise to an

inference of unlawful discrimination.'" *Aulicino*, 580 F.3d at 80 (*quoting Brown v. Coach Stores,

Inc.*, 163 F.3d 706, 709 (2d Cir. 1998)).

Defendants do not dispute that Dietrich has established that their decision not to promote

him was an adverse employment action; they seek dismissal of this claim on the grounds that

Dietrich has not raised an inference that their decision was the product of discrimination.  (Def.'s

Br. at 13.) That leaves the Court to decide whether Dietrich has presented evidence sufficient at

least to create a genuine dispute of fact concerning Defendants' intent.

Where, as here, the plaintiff complains that he was denied a promotion to a position that

was eventually filled by other individuals, he may raise an inference of discriminatory intent by

"show[ing] he was similarly situated in all material respects to the individuals with whom [he]

seeks to compare h[im]self." *Martinez v. Davis Polk & Wardwell LLP*, 208 F. Supp. 3d 480,

486–87 (E.D.N.Y. 2016), *aff'd,* 713 F. App'x 53 (2d Cir. 2017) (quoting *Graham v. Long Is.

R.R.*, 230 F.3d 34, 39 (2d Cir.2000)). "In the context of a promotion, that means comparing the

qualifications of the plaintiff with those of the person promoted." *Id.*  So viewing the evidence in

the light most favorable to Dietrich, the fact that Redmond recommended at least two younger detectives with fewer years on the job than Dietrich for promotion – Rivera and Brownlee – is at least some evidence that the decision to not recommend Dietrich was motivated by a discriminatory intent. That is enough to satisfy the minimal burden imposed by the first step of the *McDonnell Douglas* framework.

Furthermore, Dietrich testified that Redmond asked him whether he would retire if promoted to Detective First Grade. (Pl.'s 56.1 ¶ 100.) Comments by a supervisor during a job interview that imply a candidate is nearing retirement may establish an inference of discrimination. For example, in *Isaac v. City of New York*, 701 F. Supp. 2d 477 (S.D.N.Y. 2010), the court found an inference of age discrimination in part based on a supervisor's statement that he "did not want someone who thinks they can take this position at the end of their career and coast." *Id.* at 487. Redmond's question regarding Dietrich's retirement plans supports the same inference.

Dietrich has therefore made the *prima facie* showing necessary to proceed on his failure to promote disparate treatment claim.

> ii. *Defendants' Legitimate, Non-Discriminatory Reasons.*

Having established that Dietrich has made a prima facie showing with respect to his failure to promote claim, the burden shifts to the Defendants to "produce evidence in support of [their] legitimate, nondiscriminatory reason" for the decision. *Isaac*, 701 F. Supp. 2d at 487 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). "This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal quotation marks omitted).

Here, Defendants have presented evidence of a legitimate, nondiscriminatory reason for not promoting Dietrich to the rank of Detective First Grade: he was an ill-tempered and insubordinate employee during his time at the EPU and the UOU, which led Redmond and Galati to believe that he was "difficult" and "not a team player." (Def.'s 56.1 ¶ 91.)

Defendants offer ample evidentiary support for this nondiscriminatory explanation. Dietrich was admonished for watching videos on an iPad and chewing a toothpick while on duty.  (*Id.* ¶¶ 89, 92, 93.)  He also admitted at his deposition that he voiced frustration in response to his transfer to the UOU. (*Id.* ¶ 94.)  While Dietrich contests the claim that he was caught sleeping on the job by citing performance evaluations that he has failed to submit to this Court, the only evaluation in the record that covers some of the relevant time period corroborates Defendants' legitimate reasons for not promoting Dietrich.  In that report, from May of 2017, Pfeffer states that "Dietrich's comportment [while assigned to the UOU] was terrible, he was outwardly disgruntled, and his disenchantment was obvious," leading to his "utilization of crass obscenities toward[s] [his] supervisors." (Dandrige Decl. Ex. L at 2.)  In the same review, Sergeant Peragallo noted that Dietrich "on a daily basis voiced his displeasure . . . with his assignment." (*Id.*)

And Dietrich's behavior did not improve when he returned to the EPU.  In 2018, Briscoe formally reported that Dietrich violated departmental rules and procedures by being insubordinate and "conduct[ing] himself in a discourteous manner." (*Id.* Ex. K at 1.) That is further support for the idea that Redmond and Galati had valid reasons for not promoting Dietrich.

Therefore, Defendants have met their burden to identify legitimate, non-discriminatory reasons for not promoting Dietrich to the rank of Detective First Grade, which meets their burden under the *McDonnell Douglas* framework.

### iii.   Dietrich's proof of pretext

Defendants have erased the presumption of discrimination in Dietrich's favor.  Now he must prove that the Defendants' proffered reasons are mere pretext for what was truly discrimination. *Reeves*, 530 U.S. at 143.

A plaintiff can establish that the Defendants' "non-discriminatory rationale is pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Delville v. Firmenich Inc.*, 920 F. Supp. 2d 446, 462 (S.D.N.Y. 2013) (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Dietrich points to three facts in support of his argument that the court should find a genuine issue of fact regarding Defendants' purportedly pretextual reasons for denying him the promotion: first, there is no support for the Defendants' view that Dietrich was "not a team player" in his performance evaluations; second, several other detectives who were younger and less qualified were promoted instead of Dietrich; and, third, Redmond asked Dietrich whether he would retire if promoted to Detective First Grade during their initial interview, and called him a "hairbag."

### 1.   Performance Evaluations

Dietrich claims that the Defendants' depiction of him as "difficult" and "not a team player" is unfounded because Defendants have not offered documentation of each alleged

20

instance of unprofessional conduct, and because his numerical ratings – even on his negative

reviews – show that "he was considered to be at the very least above average." (Pl.'s Opp. at 17-

18.)  He also relies on prior positive evaluations to demonstrate that he would have been

promoted were it not for his supervisors' animus.

 Dietrich's performance reviews do not raise a triable issue of fact as to pretext.

 First, Dietrich wrongly suggests that Defendants must present documentary evidence to

meet their burden of production under the *McDonnell Douglas* framework.  An employer need

only "articulate some legitimate, non-discriminatory reason" for its action to shift the burden

back to the employee. *See McDonnell Douglas*, 411 U.S. at 802.  It may do so through any

admissible evidence. *Cortes v. MTA New York City Transit*, 802 F.3d 226, 231 (2d Cir. 2015).

That includes the undisputed testimony that Dietrich watched videos and chewed a toothpick

while on duty, and later was reprimanded by Briscoe for insubordination.  It also includes the

performance evaluation where Pfeffer affirmed in writing that Dietrich directed profanity at his

superiors.

 Second, Dietrich cannot cast doubt over Defendants' stated non-discriminatory reasons

by pointing to a *lack* of documentary evidence from defendant without making an affirmative

presentation of his own.  A plaintiff seeking to rebut a purportedly non-discriminatory reason for

an adverse employment action "must produce evidence and carry the burden of persuasion that

the proffered reason is a pretext." *Id.* (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169

(2d Cir. 2006)). Dietrich cannot bring the issue of pretext to a jury when he has adduced no

evidence to rebut the Defendants' reports of unprofessional conduct or to suggest that their

evidence is false. His testimony as to the Defendants' biases is wholly conclusory and utterly unsupported by anything in the record.

Third, a claim that an employee received positive performance evaluations in the past does not give rise to a genuine issue of act that subsequent negative reviews were pretextual. *See Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010).  In *Mattera*, the court rejected the argument that "good reviews in the past" could give rise to a reasonable inference that "very specific and well-documented performance failings in the present" were suspect. *Id.* at 577.  The same is true here: past favorable performance reviews do not prove that subsequent negative reviews were the product of a forbidden animus.

In fact, the Defendants' position regarding Dietrich's lack of professionalism and Dietrich's negative reviews is even stronger than was the case in *Mattera*.  There, the plaintiff claimed his evaluations were fabricated.  *Id.* at 577.  Not so here: Dietrich admits he was reprimanded on multiple occasions, and does not dispute the description of his behavior contained in his negative 2016-2017 performance review.  Nor does he dispute the reasons given for Briscoe's 2018 command discipline.  Therefore, Dietrich concedes that the performance reviews before this court do not refute, but actually reinforce, Defendants' claim that he was "not a team player."

## 2.   Other Promoted Detectives

Dietrich then claims that a triable issue of fact as to pretext exists because, "Almost every other officer in the EPU was promoted during [his] time" and "these detectives were younger than me and had less rank and seniority." (Dietrich Decl. ¶ 19.)  This argument is equally flawed.

In order to proceed to trial on the theory that the promotion of younger detectives proves that Defendants acted pursuant to a discriminatory motive when denying his promotion, Dietrich must offer evidence in support of three things. First, he must identify particular younger detectives who obtained promotions despite while similarly situated to him – which the record supports with respect to detectives Brownlee and Rivera. (*See, e.g.*, Def.'s 56.1 ¶¶ 156-161.) Then, Dietrich must present some evidence that their promotion was the product of discriminatory animus.  Finally, he must show that the Defendants' articulated reason for not promoting him was a pretext designed to conceal that animus.

Dietrich insists that the fact that "less deserving" detectives earned promotions proves animus and pretext, but the claim that Brownlee and Rivera were "less deserving" detectives than Dietrich is irrelevant to his claim of age discrimination.  The critical question is not whether those detectives "earned" their promotions, but whether the Defendants were motivated to promote them in order to discriminate against Dietrich on the basis of his age.  *See McPherson v. New York City Dept. of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006).  That is, even if Dietrich were to present undisputed evidence that a younger detective was promoted due to nepotism or some other objectionable reason, as long as that reason was not predicated on age, he would be no closer to showing that he was the victim of age discrimination, or that his superiors' view of him as "difficult" was a smokescreen.

In *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93 (2d Cir. 2010), the Second Circuit held that an employee had presented a triable issue regarding pretext with evidence showing that the employer selectively enforced its disciplinary policies against older employees while failing to address offenses committed by younger workers. *Id.* at 108-109. Applying that reasoning here, in order to prove that the Defendants' real reasons for not promoting him were discriminatory,

Dietrich must "demonstrate how any of [those younger] individuals were treated differently under circumstances *similar to his*." *Holowecki v. Federal Exp. Corp.*, 644 F. Supp. 2d 338, 353 (S.D.N.Y. 2009). That sort of evidence – *i.e.* that a younger detective made First Grade over Dietrich despite being insubordinate and unprofessional – is entirely absent here.

While Defendants have presented evidence that detectives very close in age to Dietrich received promotion recommendations from Redmond, Dietrich has not offered anything more than conclusory allegations in support of his claim that younger detectives in the EPU received promotions they did not deserve. There is no evidence in the record that any of the promoted individuals had received a command discipline, or been caught behaving unprofessionally, or directed obscenities towards their supervisors – all of which, as noted above, is undisputed as to Dietrich. Absent some showing that these younger promotees – specifically Rivera and Brownlee – were similarly situated to Dietrich in this way, the mere fact that they were promoted while a few years younger than Dietrich is insufficient to raise a question about whether  Defendants' articulated reasons for not promoting Dietrich were a pretext for age discrimination.

### 3.   Redmond's Comments

Finally, having conceded that he engaged in several of the concerning behaviors flagged by his commanding officers, Dietrich hangs his claims of pretext on two age-related remarks: Redmond's question about Dietrich's retirement plans during their initial interview, and Redmond's use of the term "hairbag."

Redmond's question regarding Dietrich's retirement plans in the event he was promoted is not probative of a discriminatory intent. "[E]mployment decisions driven by factors that are empirically intertwined with age are not discriminatory so long as they are motivated by some feature other than the employee's age." *Criley v. Delta Air Lines, Inc.,* 119 F.3d 102, 105 (2d

Cir.1997) (internal quotation marks omitted).  It is true that retirement is a topic generally related to an employee's age.  However, the record makes clear that age was not why Redmond asked the question; rather, Redmond wanted to know how long Dietrich would continue to serve on the EPU, because he "needed somebody for the whole term, possibly two terms." (Dietrich Tr. at 55:24-25.)  As the Second Circuit held in *Chapotkat v. Cty. of Rockland*, 605 Fed. Appx. 24 (2d Cir. 2015), the ADEA does not prohibit questions "concerned with the length of the incoming [employee's] tenure," so long as those questions are aimed at reducing "the inefficiency of a frequently-recurring hiring process." *Id.* at 27.  Besides, Redmond asked Dietrich the question, and hired him to the EPU, at least a year before Redmond and Galati decided that Dietrich had become "difficult" to work with, and several years before Dietrich ultimately chose to retire. That gap undercuts any inference that Redmond's discriminatory intent, as opposed to Dietrich's job performance once hired, was the "but-for" cause of Dietrich's eventual retirement from the rank of Detective Second Grade.

That leaves the "hairbag" remark, which, standing alone, is insufficient evidence to create a genuine dispute as to Redmond's motive for not recommending Dietrich for promotion.  At his deposition, Dietrich testified under oath that the term "hairbag" was not an ageist comment, because it could refer to either younger or older detectives.  (Dietrich Tr. at 105:6-20.) Although he has submitted an affidavit to the contrary in opposition to the motion for summary judgment, it is well-settled that a party may not create triable issues "by submitting an affidavit . . . that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep. Of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  Yet that sort of contradiction is all Dietrich has to support his claim that Redmond's "hairbag" comment was a reference to his age. (Bellovin Decl., Ex. 6, Dietrich Decl. ¶ 16.)  When the timing of a plaintiff's self-serving

25

testimony coincides with a defendant's attempt to dispose of his case, courts may take into account "the likelihood that it was intended solely to defeat the motion for summary judgment" to determine whether the affidavit only raises a "sham issue of fact." *In re Fosamax Prods. Liability Litig.*, 707 F.3d 189, 195 (2d Cir. 2013). The discrepancy between his testimony and his affidavit means that Dietrich cannot rely on his "hairbag" allegations to raise a genuine dispute that age-based animus was the but-for cause of Redmond's decision to not recommend him for promotion.

Moreover, even if the prior testimony did support the conclusion that "hairbag" is an ageist term, stray comments only "constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists" between the statements and the adverse employment action. *Fazzari v. Cohen, Pontani, Lieberman, & Pavane, LLP,* No. 14-cv-6549, 2019 WL 1258483, at *12 (S.D.N.Y. Mar. 19, 2019). In determining whether a remarks are probative of discriminatory motive, fact-finders consider:

> "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."

*Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010).

Here, a jury could not rationally apply these factors and find that Dietrich's second-hand claim that Redmond called him a "hairbag" was the real reason the detective was not promoted, as opposed to the numerous, documented instances when Dietrich failed to conduct himself in a professional manner.

As an initial matter, to the extent "hairbag" is used exclusively to describe older police officer – a fact Dietrich's own deposition testimony calls into question – the content of the term

does not constitute the sort of age-based stereotype of incompetence or lack of productivity that forms "the very essence of age discrimination." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Courts have dismissed claims based on much more pointed comments than those at issue here, when, as in this case, there is no evidence of any causal nexus between the comments and the adverse employment action.  In *Fazzari v. Cohen, Pontani, Lieberman, & Pavane, LLP,* the plaintiff, an attorney with thirty years' experience, complained that his firm criticized him for "relying on 'old' caselaw" with the senior partner emphasizing the word "old." *Id.* at \*7.  When plaintiff responded to the comment by requesting electronic legal research training, his supervisors told him to "let the younger attorneys do it." *Id.*  The court ruled that such comments, which were made in 2009, could not support the inference that the plaintiff's employer acted with discriminatory intent a year and a half later when he was fired. *See, e.g.*, *Fazzari*, 2019 WL 1258483, at \*12.

For the same reason, Dietrich fails to show a causal nexus between the "hairbag" comment and the decision to not recommend Dietrich for promotion. Galati allegedly told Dietrich about Redmond's comment in March of 2017, but we have no idea when Redmond made the remark or when in time he allegedly did so relative to any decision not to recommend Dietrich for promotion. Critically, Dietrich has not offered any evidence that Redmond made the comment "in the context of promotion decision-making," *Koenig v. City of New Haven*, No. 16-cv-514 (JCH), 2018 WL 1440175, at \*8 (D. Conn. Mar. 21, 2018) – as he must to succeed on a failure to promote disparate treatment claim. In *Koenig*, the court granted the defendants' motion for summary judgment and ruled that the plaintiff could not raise a triable issue of discrimination in connection with a promotion decision when the discriminatory comments were made during an unrelated disciplinary proceeding. *Id.* Dietrich's allegations with respect to the "hairbag"

remark bear the same defect: just like the plaintiff in *Koenig*, Dietrich fails to present any evidence that Redmond called him a "hairbag" while considering whether to promote him.

Additionally, Redmond is only two years younger than Dietrich, which undercuts any claim of age discrimination even further.  A single potentially offensive comment by a supervisor very close in age to Dietrich is not sufficient evidence to support the proposition that age discrimination was the reason Dietrich failed to reach the rank of Detective First Grade. *See Grant v. New York Times Co.*, No. 16-cv-3175 (PKC), 2017 WL 4119279, at *7 (S.D.N.Y. Sept. 14, 2017) ("A member of the same protected group may hold a discriminatory animus against other members of that group but, depending upon the context, the inference may become implausible."); *Starr v. Legal Aid Soc. of City of N.Y.*, No 96-cv-6888, 1998 WL 477733, at *3 (S.D.N.Y. Aug. 14, 1998).  Redmond's age relative to Dietrich's further supports the inference that "hairbag" is not an age-based slur.

Defendants are entitled to summary judgment on Dietrich's ADEA and NYSHRL disparate treatment claims.

### c.   Plaintiff's disparate treatment claim under the NYCHRL fails because there is no genuine dispute of material fact that age was a "motivating factor" in the Defendants' decision to not promote him.

Dietrich's claim for age discrimination under the New York City Human Rights Law fares no better.

Like its state and federal counterparts, the NYCHRL prohibits workplace mistreatment that is motivated by discrimination "because of" a protected status.  N.Y.C. Admin. Code § 8–107(1).  However, unlike ADEA claims, the plaintiff may defeat summary judgment by presenting evidence "from which it could rationally be inferred that age discrimination was a motivating factor, even in part" for his employer's actions.  *Forrester v. Corizon Health, Inc.*,

278 F. Supp. 3d 618, 627 (E.D.N.Y. 2017) (quoting *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 128, 946 N.Y.S.2d 27, 41 (2012)).  An employee may defeat summary judgment on a NYCHRL claim using a mixed motives theory even where, as here, the defendant is entitled to summary judgment under the *McDonnell Douglas* framework. *Melman*, 946 N.Y.S.2d at 40.

This additional leeway notwithstanding, Dietrich fails to prove his NYCHRL claim for the same reason he failed to prove his claims under state and federal law. His case lacks an essential ingredient: any nonspeculative proof that any Defendant decided to deny Dietrich the promotion "because of" his age. *See Okeke v. New York & Presbyterian Hosp.*, 275 F. Supp. 3d 470, 482 (S.D.N.Y. 2017).  He has not shown that the NYPD "treated [him] less well than other similarly situated employees," *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 836 (S.D.N.Y. 2013); nor has he adduced evidence that the Defendants had a pattern or practice of giving younger employees preferential treatment with respect to promotions, *see Okeke*, 275 F. Supp. 3d at 482; *Nixon v. TWV Admin. LLC*, No. 16-cv-6456 2017 WL 4712420, at *5 (S.D.N.Y. Sept. 27, 2017).

A lack of evidence is not the only reason to dismiss Dietrich's claim that age was a "motivating factor" for the decision not to promote him.  As under the *McDonnell Douglas* framework, proof that other members of Dietrich's protected class received promotions undermines the notion that age factored into his lack of advancement.  *Cf. Colon v. Trump Intern. Hotel & Tower*, No. 10-cv-4794, 2011 WL 6092299, at *7 (S.D.N.Y. Dec. 7, 2011) (granting summary judgment on NYCHRL claims).  Furthermore, Dietrich's sincere belief that the younger detectives promoted ahead of him were less deserving cannot defeat a motion for summary judgment in the absence of any corroborating evidence, even under the "motivating factor" standard.  *Id.* at *8 (citing *Bickerstaff v. Vassar Coll.*, 196 F. 3d 435, 456 (2d Cir. 1999)).

*            *            *

Having reviewed the record as a whole, the Court concludes that no reasonable jury could find age discrimination to be a but-for cause of, or a motivating factor in, plaintiff's termination. Defendants' motion for summary judgment on plaintiff's disparate treatment age discrimination claims is granted.

## II.   Defendants Are Entitled to Summary Judgment on Plaintiff's Hostile Work Environment Claims.

Defendants also move for summary judgment on Dietrich's hostile work environment claims under city, state, and federal law.  Dietrich opposes the motion based on three perceived wrongs: (i) his transfer to the UOU; (ii) his inferior assignments within the EPU; and (iii) Redmond referring to him as a "hairbag."  Defendants' motion is granted.

### a.   Legal Standards

#### i.   *ADEA and NYSHRL*

Being forced to endure a hostile work environment is one type of adverse employment action.  As with disparate treatment claims, ADEA and NYSHRL hostile work environment claims are subject to the same standard.  *See, e.g.*, *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 578 (S.D.N.Y. 2011) (citing *Patterson v. Cty. of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004)).

A triable hostile work environment claim under either state or federal law requires evidence that the plaintiff's workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment . . . ." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).  Plaintiff must show that the Defendants acted on the basis of a protected characteristic to "[create] an environment that is both objectively and subjectively hostile," meaning "not only

30

that [the plaintiff] found the environment offensive, but that a reasonable person also would have found the environment offensive." *Bermudez*, 783 F. Supp. 3d at 578 (citing *Richardson v. N.Y. Dep't of Corr. Serv.*, 180 F.3d 426, 436 (2d Cir. 1999)).  An environment is hostile when it is "prove[n] that the [offensive] incidents were sufficiently continuous and concerted to be considered pervasive." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240–41 (2d Cir. 2007) (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318).  When assessing whether an environment is "hostile" or "abusive," relevant factors include: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's 'work performance.'" *Bermudez*, 783 F. Supp. 2d at 578 (quoting *Harris*, 510 U.S. at 23).

> ii.   *NYCHRL*

The threshold for maintaining a hostile work environment claim is lower under the NYCHRL: a plaintiff need only show that he has been treated "less well" because of his age or other protected class. *Waters v. Gen. Bd. of Glob. Ministries*, 769 F. Supp. 2d 545, 557 (S.D.N.Y. 2011) Even a single comment may be actionable under NYCHRL "in appropriate circumstances." *Awad v. City of New York*, No. 13-cv-5753, 2014 WL 1814114, at *7 (E.D.N.Y. May 7, 2014) (quoting *Gorokhovsky v. N.Y.S. Hous. Auth.*, 552 Fed. Appx. 100, 102 (2d Cir. 2014)).  A hostile work environment claim under NYCHRL should only be dismissed if plaintiff alleges nothing more than "a petty slight or trivial inconvenience." *Hernandez v. Kaisman,* 103 A.D.3d 106, 957 N.Y.S.2d 53, 58–59 (2012) (quotations and citations omitted).

Because Dietrich fails to offer evidence of any severe incidents of harassment that materially altered his working conditions, or any incident that rises above the level of a "petty slight," Defendants are entitled to summary judgment on his hostile work environment claims.

**b.** __Plaintiff fails to raise a genuine issue of material fact that he suffered an__
__objectively severe incident of harassment under either the ADEA or the__
__NYSHRL.__

Dietrich cannot maintain a hostile work environment claim on the basis of his
reassignments to the UOU and within the EPU.  Setting aside the lack of evidence that the
decisions to move him to different details were the products of age-based animus, reassignment
to less desirable duties, even when done as a form of discipline, is not severe or pervasive
enough behavior to create a hostile work environment. For example, in *Villar v. City of New
York*, 135 F. Supp. 3d 105 (S.D.N.Y. 2015), the court granted summary judgment on a hostile
work environment claim to NYPD defendants who placed the plaintiff under the supervision of
an inferior officer, made her perform janitorial duties, and denied her overtime.  *Id.* at 133.  Even
though the plaintiff alleged that she was humiliated by performing her new routine, my late
colleague, Judge Deborah A. Batts, concluded that a lack of evidence of physical threats or any
other "extraordinarily severe" incidents entitled the defendants to summary judgment. *Id.*
Likewise, in *De la Cruz v. City of New York*, 783 F. Supp. 3d 622 (S.D.N.Y. 2011), the court
found that changes to a City employee's work schedule, combined with increased scrutiny of his
performance, were not enough to establish that the defendants had created a hostile work
environment. *Id.* at 644. The decisions in *Villar* and *De la Cruz* make clear that Dietrich cannot
prove a hostile work environment claim based on his subjective displeasure regarding his
assignments in the UOU and the EPU.

The remaining question is whether the totality of the circumstances tend to show that the
second-hand "hairbag" remark created a hostile work environment.  It does not --  again, because
"the Court must accept as true plaintiff's earlier deposition testimony," when the only
countervailing evidence is the plaintiff's affidavit opposing summary judgment.  *Bennett v.*

*Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 241 n.1 (S.D.N.Y. 2001).  That deposition testimony revealed that "hairbag" was not an age-related remark.

However, even if Redmond had actually called Dietrich a hairbag, and even if Galati had conveyed that comment to Dietrich during their March 20, 2017 meeting, three of the four factors relevant to the totality of the circumstances analysis clearly cut against Dietrich's hostile work environment claim. Redmond is alleged to have made only one offensive comment, on one occasion. There is no allegation or evidence that Redmond's comment interfered with Dietrich's ability to carry out his job duties – in fact, he did not even know about it when it was made.

As for the final factor, severity of the incident, it is true that a single event – such as a sexual assault – can create a hostile work environment. *See Tomka v. Seiler Corp.*, 66 F. 3d 1295, 1305 (2d Cir. 1995) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).  It makes sense that, even though the frequency of offensive conduct is relevant to the hostility level of a workplace, a victim of sexual assault can prevail on a hostile work environment based on a single incident.  They have experienced severe physical harm and humiliation, the memory of which may interfere with their work long after the incident.  And, similar to a rape or sexual assault, "an obscene and humiliating verbal tirade . . . that undermines the victim's authority in the workplace . . . meet[s] the extraordinarily severe standard" necessary to prove a hostile work environment claim.  *Mathirampuzha v. Potter*, 548 F.3d 70, 78-79 (2d Cir. 2008) (internal quotation marks and citations omitted).

The comment at issue here, even if it had been made directly to Dietrich's face, could not possibly inflict comparable trauma.  Dietrich only alleges a single instance where any of the Defendants described him as a "hairbag." However, "Stray remarks regarding . . . seniority" must be frequent and pervasive to generate actionable humiliation and interference. *See De la*

*Cruz*, 783 F. Supp. 2d at 644. That is all the more true where, as here, "Plaintiff testified that he viewed this remark as having multiple interpretations." *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 184 (E.D.N.Y. 2015).

Accordingly, Redmond's "hairbag" comment is not an adequate basis for a hostile work environment claim under the ADEA or the NYSHRL.  Defendants are entitled to summary judgment on the hostile work environment claims.

### c.   Plaintiff's hostile work environment claim under the NYCHRL fails because there is no genuine issue of material fact that any of Defendants' conduct rose above the level of "petty slights."

Again, Dietrich has made no showing that his reassignments were made because of his age, even in part.  Other detectives, both within his protected class and without, were transferred in the same way.  Therefore, he cannot show that those reassignments created a hostile work environment under the NYCHRL. Nor can the NYCHRL claim survive summary judgment on the "hairbag" comment.  Again, Dietrich has only raised a "sham issue of fact" with respect to this allegation. *Fosamax*, 707 F.3d at 195.

Sham or not, Defendants would still be entitled to summary judgment on the NYCHRL claim regardless.  The decision in *South v. Cont. Cas. Co.*, No. 17-cv-5741, 2018 WL 4689106 (S.D.N.Y. Sept. 27, 2018) makes clear that Galati's recitation of Redmond's alleged comment – even assuming that Dietrich had not testified under oath that the comment had nothing to do with age – would fall  into the category of inactionable "petty slights."  In *South*, the plaintiff asserted a hostile work environment claim based on an email from one of his supervisors to another saying that they did not want "long term lawyers" handling particular cases. *Id.* at *11.  There, as here, the plaintiff failed to adduce any other evidence of discriminatory intent to corroborate his suspicions.  There, as here, the speaker of the comment in question was also a member of the

plaintiff's protective class.  Accordingly, the Court concluded that "even under the more liberal NYCHRL [standard]" the plaintiff had failed to raise a genuine dispute of material fact that "necessitat[ed] a trial." *Id.* at *13.

If the comment in *South* was a petty slight, so too was the "hairbag" comment. Even under the more forgiving NYCHRL standard for proving a hostile work environment claim, Dietrich has not marshalled sufficient evidence to defeat Defendants' motion for summary judgment.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 88 and terminate the case.  This shall constitute the written opinion of the Court.

Dated: July 23, 2020

_____

Chief Judge

BY ECF TO ALL COUNSEL